IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:05 CR 3116 |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| JOSE HERNANDEZ and | ) | REPORT, RECOMMENDATION |
| URIEL HERNANDEZ, | ) |         AND ORDER |
| | ) | |
| Defendants | ) | |

Defendants have filed motions to suppress evidence seized as a result of a traffic stop on Interstate 80 in Nebraska on October 8, 2005. First, both defendants challenge the legitimacy of the traffic stop. Both also challenge both the fact and the voluntariness of their alleged consents to the search of the vehicle. An evidentiary hearing was held on the matter on December 19, 2005, and the matter is now ready for decision.

FINDINGS OF FACT

On that date at approximately 10:05 a.m. Trooper Jeff Roby, a nine-year veteran of the Nebraska State Patrol, was driving westbound in his cruiser when at mile marker 318 he noticed an eastbound blue-gray minivan with no front license plate. He also could not make out its back plate, so he decided to follow the van to check its license plates. He turned around and proceeded eastbound. Before he caught up to the van, he saw the van following a semi truck at what to him was "an unsafe distance." He testified that in his judgment, following another vehicle at a

distance less than two seconds behind (i.e. at such a distance that it would take the following vehicle two seconds to reach the rear of the lead vehicle if the lead vehicle had to stop suddenly). Roby testified that his training and experience led him to believe that such following violated the Nebraska "Rules of the Road." He therefore decided to and did activate his in-car video camera, and when he caught up to the van, he pulled in behind the van in the driving (right) lane and activated his cruiser's overhead lights to stop the eastbound van. The van pulled over to the shoulder of the road without incident.

Roby exited his vehicle and approached the van on the passenger side, where he told the driver the reason for the stop and asked for the vehicle's registration and insurance documents as well as for the driver's operator's license. The driver was Jose Hernandez ("Hernandez"). There was one passenger in the minivan, riding in the second seat, just behind the driver. He was identified as Uriel Hernandez Ruiz ("Ruiz"). In response to Roby's request, Hernandez opened the glove box of the vehicle to look for the documents. Ruiz gave Roby a Wisconsin drivers license identifying him as Uriel Hernandez Ruiz. The driver said "No license" to Roby, but handed Roby an insurance card. Because the driver did not provide any drivers license, Roby asked him to write his name and date of birth on the back of the insurance card. Hernandez did so. (Exhibit 3). Continuing on his quest for the driver's identification, Roby asked him if he had a wallet which had any identification in it. Hernandez did not understand that word at first, but on further questioning by Roby asking him if he had any money in a wallet, Hernandez opened his wallet and held out to Roby the cash in it. Roby said that he wasn't interested in the money, only his identification, and then Hernandez gave him the wallet. In the wallet Roby found a Cook County, Illinois probation

card for Jose Hernandez, as well as what he thought might be a Mexican drivers license with a photo of Hernandez and identifying him as Jose Hernandez.  In response to Roby's question of who owned the vehicle, Ruiz answered that it belonged to Hernandez's cousin, who was a friend of theirs and also that they had borrowed it to make a trip to Phoenix and were on their way back to Chicago.  Ruiz also indicated that they had been in Phoenix only one day.

On his way back to his cruiser to request that his dispatcher check on the driver, the passenger, and the vehicle, Roby attempted to get additional information from the back, temporary license plate.  This effort was futile, and Roby also was unable to get additional information from the vehicle identification number ("VIN") appearing on the insurance card.  Roby requested the information on the defendants through his dispatcher, and began writing a warning ticket for the driver, for following too close, no operator's license, no proof of ownership of the vehicle, and no vehicle registration.

After a few minutes, dispatch advised that Hernandez had no "match" in either Illinois or Arizona.  Ruiz had a revoked drivers license from Wisconsin.  The vehicle had not been registered in either Illinois or Wisconsin.

Roby returned to the van and advised the occupants that neither of them had a valid operator's license and neither should be driving.  He also asked Hernandez to sign the warning ticket, and Hernandez complied. Exhibit 2.  Roby then asked Hernandez why he was on probation in Illinois, to which Ruiz answered that Hernandez had some trouble with identification in Illinois.  Roby handed back all the documents he had been given as well as the

3

warning ticket, explained the warning, and advised defendants that the stop was over.

Immediately Roby asked the occupants if he could ask them some questions, and, without waiting for a response, asked them if they had any guns in the vehicle, also using the terms "pistols" or "pistolas." Specifically, Roby said, "May I ask you some questions do you have any weapons in the vehicle?" and there was no pause between "...questions" and "do you...." Ruiz answered "no," and Hernandez sat silently. Roby then asked if there were any "drugs" or "drugas" in the vehicle, naming marijuana and cocaine. Ruiz answered "no" to each question, and Hernandez again remained silent. Roby then asked if he could "look through" or "search" the van. Ruiz immediately said "yes" or "go ahead," and Hernandez again remained silent. Ruiz then said something to Hernandez in Spanish, after which Hernandez nods affirmatively. Roby then asked Hernandez directly, "Is it OK that I look through and search the vehicle?" and Hernandez continues to nod affirmatively. Roby then asked both occupants to exit the van, and Hernandez exited from the driver's door first, followed by Ruiz exiting through the passenger side rear door. After they had exited the van, Roby again asked them if they had any "drugas" or "pistolas" on them, and both answered "no." Roby then patted down each defendant, and then had them sit in Roby's patrol vehicle during the search.

Another trooper, Trooper Greg Goltz, arrived to assist Roby, and the two of them commenced the search. Approximately two to three minutes later one of them noticed "something non-factory" about the center console of the vehicle. At that point both defendants were advised the troopers had found "something in the vehicle," and that they were being detained. Both were then

4

handcuffed.  A short time later, when the secret compartment was opened and drugs were found, the defendants were arrested.

                              DISCUSSION

Defendant Ruiz's "Standing"

The government argues that Defendant Ruiz, being only a passenger in the van, can claim a legitimate expectation of privacy in the contents of the van other than his own belongings.  However, neither of the van's occupants can claim anything other than the position of a bailee, since there were no documents showing the ownership of the vehicle, and they were traveling together.[1]  Under these circumstances I would be inclined toward a conclusion that neither occupant had any more legitimate expectation of privacy than the other.  Because of my ultimate conclusions, however, I need not resolve that issue.  Ruiz certainly can challenge the stop and his own detention. See, United States v. Lyton, 161 F.3d 1168 (8th Cir. 1998)[2]

The Stop

Both defendants claim that Trooper Roby did not have probable cause to stop their vehicle for following too close.  If the stop was not supported by probable cause, the evidence derived from it

---

[1] There was no evidence, however, that Ruiz was assisting with the driving.

[2] Though "only a passenger" in the vehicle:
"Lyton may challenge the stop and detention and argue that the evidence should be suppressed as fruits of illegal activity. See United States v. Portwood, 857 F.2d 1221, 1222 (8th Cir.1988) (passenger may contest legality of stop), cert. denied, 490 U.S. 1069, 109 S.Ct. 2073, 104 L. Ed.2d 638 (1989).
161 F.3d at 1170.

must be suppressed as "fruit of the poisonous tree." Specifically, the issue is whether a reasonable officer in the position of Trooper Roby would have believed that s/he was witnessing a traffic violation.

In this case Trooper Roby turned on his in-car video camera before he actually caught up to the defendants' vehicle. He testified that he activated the camera because he thought the van was following the truck too closely. The video tape shows the defendants' van following the semi-truck from some distance behind. At this point the patrol vehicle was in the left lane and the truck and minivan were both in the right lane. To say the least, it is difficult to estimate the distance between the rear of the truck and the front of the van. However, Roby testified that he estimated their distance by timing their respective traveling under an overpass, and in that way determined the time between them. The tape does show both vehicles passing under the overpass, and, assuming the tape was not altered to speed its playing, it appears that there is little more than one second between their passing under the overpass.

The video tape also shows the van moving to the left side of the driving lane, as if to pass the truck. No turn signal appears to have been given, however. When Roby's vehicle pulls over to the right lane and the overhead lights are activated (as shown by an "L" appearing superimposed on the video tape), the van immediately moves back to the center of the right lane and then to the shoulder of the road to stop.

The applicable state statute upon which Trooper Roby relied in making this stop, states in pertinent part:

> (1) The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, and such driver shall have due regard for the speed of such vehicles and the traffic upon and the condition of the roadway.

Neb. Rev. Stat. §60-6,140 (1).  The statute does not define "more closely than is reasonable and prudent," although in other "following" provisions of the same statute additional guidance is provided which is applicable only to those separate subsections. See, e.g. subsections (2), (3), (4), and (5).

Trooper Roby testified that the "two-second rule" is taught in driver education classes and is cited in the Nebraska drivers' manual.  In addition, he stated that his own training and experience had taught him that it is usually a prudent gauge of safe following distances.  This court has previously held that violating Nebraska's uncodified "two-second rule" was sufficient to justify a traffic stop.  See, e.g., United States v. Guarino, 82 F. Supp. 2d 1024 (D. Neb. 1999), as has the Eighth Circuit Court of Appeals.  United States v. Lyton, 161 F. 3d 1168 (8th Cir. 1998). The elasticity of the statute is especially troubling, because such an open-ended, judgmental rule yields itself to capricious enforcement.  In this case, however, there is no evidence that Roby was engaged in anything untoward when he concluded the defendant's vehicle was following too close.[3]

My reviewing of the videotape on several occasions yields the conclusion that it is not conclusive; that is, both the speed and

---

[3] Inferentially, the fact that Roby activated his camera before his overhead lights would not be consistent with any improper actions; that is, if the van had not been traveling too close to the truck, it is doubtful that he would have activated the camera to record that.  I make no such finding, however.

the following distance are, at best, difficult to determine with any degree of precision or confidence.  The videotape does show the truck and the van passing the overpass, and, assuming the videotape plays at real speed, I estimate the time between them to be approximately one second.  The trooper testified that they were not speeding, and estimated their speed at approximately 70 mph.[4]  I think under any standard of "reasonable and prudent," following a semi-truck only one second's distance behind it at 70 mph would likely violate the statute.  Thus, I conclude that any reasonable law enforcement officer in Trooper Roby's position would have held a fact-based belief that the statute was being violated.  The stop, therefore, was supported by probable cause.

The Consent(s)

Both defendants[5] argue that their purported consents to allow the search of the vehicle were not  knowingly and voluntarily given.  They point to the obvious difficulty that Roby had in communicating with defendant Hernandez as illustrative of the language barrier, and further that Hernandez could not have understood that he was being asked to consent to a total search of the vehicle.  They then conclude that a reasonable officer in Roby's position would not have believed that the consents were knowing and voluntary.  In response, the government points to several specific instances in which both Hernandez and Ruiz answered the trooper in English or complied with his English-spoken directives without asking for clarification or saying they did not understand what he was saying.

---

[4] The speed limit on this stretch of I-80 is 75 mph.

[5] Again, I am assuming that Ruiz would have "standing" to assert a legitimate expectation of privacy in the van and its contents.

8

"Typically, a reasonable investigation of a traffic stop may include asking for the driver's license and registration, requesting the driver to sit in the patrol car, and asking the driver about his destination and purpose." United States v. Ramos, 42 F.3d 1160, 1163 (8th Cir. 1994), cert. denied 115 S. Ct. 2015 (1995)(citing United States v. Barahona, 990 F.2d 412, 416 (8th Cir. 1993); United States v. Richards, 967 F.2d 1189, 1192-93 (8th Cir. 1992)).  Further inquiry, however, is limited:  "An officer must have a reasonable, articulable suspicion that a person is involved in criminal activity unrelated to the traffic violation before the officer may expand the scope of the traffic stop and continue to detain the person for additional investigation." United States v. Carrate, 122 F.3d 666, 668 (8th Cir. 1997).

However, if a driver gives the officer consent to search his vehicle, the consent obviates the need for articulable suspicion to justify the search, provided that the consent is voluntarily given under circumstances which would not support a finding that the defendant was being detained.  A consensual encounter does not trigger Fourth Amendment scrutiny unless the encounter loses its consensual nature.  Florida v. Bostick, 401 U.S. 429, 434-35 (1991).  The determination of the effectiveness of a consent requires consideration of all of the circumstances leading up to the search.  United States v. Beck, 140 F.3d 1129, 1135 (8th Cir. 1998); United States v. McKines, 933 F.2d 1412, 1419 (8th Cir.)(en banc), cert. denied, 502 U.S. 985 (1991).  So long as the consent is voluntary, the products of the search will not be suppressed. United States v. White, 81 F.3d 775, 780 (8th Cir.), cert. denied, 519 U.S. 1011, 117 S. Ct. 518 (1996).  Consent is voluntary "if it was 'the product of an essentially free and unconstrained choice by its maker,'" rather than "'the product of duress or coercion, express or implied.'"  United States v. Chaidez, 906 F.2d 377, 380

9

(8th Cir. 1990), quoting <u>Schneckloth v. Bustoamonte</u>, 412 U.S. 218 (1973).

In this case the facts lead me to conclude that the defendants did understand what Roby was saying sufficiently to know that they were being asked to consent to the complete search of the vehicle. There were numerous instances during the traffic stop from which I infer an understanding of basic, simple English to make the consents both knowing and voluntary.

As regards Defendant Ruiz, his conversations with Roby demonstrate that he had a basic command of English. For example: (1) He responded to Roby's questions in English; (2) He answered "no" immediately following Roby's questions about drugs or "drugas" and immediately responded "yes" or "sure" to Roby's request to search the vehicle; (3) He immediately responded "no" to Roby's question, "...[D]o you have any weapons in the vehicle?" and (4) Although Roby did have to use simple words, Ruiz never indicated or said to Roby that he did not understand what Roby was saying, and (5) Ruiz made no attempt to stop the search or limit or withdraw his consent during the time the search was taking place. In short, there was no action and no words uttered by Ruiz that are inconsistent with a voluntary and knowing consent.

The facts are a bit more cloudy with respect to Defendant Hernandez. Several times Hernandez acted as if he understood what Roby was saying. For example: (1) When Roby asked for his drivers license and registration, he said "no license," and began looking in the van's glove box for the vehicle's papers; (2) He obeyed Roby's request to write his name and date of birth on the back of the insurance card; (3) He signed the warning ticket at Roby's request; (4) While not responding to Roby's initial question

regarding weapons, "drugas," including "marijuana" and "cocaine," and "pistolas," Hernandez did respond when Roby later asked the same questions and did so without talking with Ruiz between the question and his answer; (5) Hernandez nodded after Ruiz said something to him after Roby asked for permission to search the car, and when Roby repeated the question directly to Hernandez, he immediately nodded affirmatively; (6) When Roby asked the defendants to exit their vehicle so he could begin the search, Hernandez exited first and without any conversation with Ruiz; (7) Although Roby perceived that Hernandez was not fluent in English and therefore simplified his words, Hernandez never said anything indicating that he did not understand what Roby was saying; and (8) During the search he made no actions or said anything to indicate that he had not, in fact, agreed to the search or was withdrawing or limiting his consent.  As with Ruiz, Hernandez never did or said anything inconsistent with consent.

On the other hand, Roby never told the defendants they could leave at the end of the stop, nor that they did not have to answer his questions, nor that they did not have to consent to the search. There is nothing in the evidence revealing any English training either of them may have had, nor their educational level, nor how long they had lived in this country.  So far as Roby knew, Hernandez had had only one previous contact with law enforcement authorities which resulted in his having a probation card from Cook County, Illinois, and Ruiz had had only one which had resulted in a revoked drivers license, in short, Roby could not legitimately infer that either of them had been questioned like this ever before.  Although the Nebraska State Patrol does have written consent-to-search forms, including Spanish versions, none was used in this case.  In response to "Why didn't you use..." such a written form, Roby responded, "I felt that I had compliance by both

11

subjects, that they understood I wanted to search the vehicle and look in the vehicle." Though the law is clear that written consent is not required for a consent to be voluntary and knowing, in this case using one would certainly have clarified the totality of the circumstances—-which are ambiguous--and might have obviated the need for this hearing.

The evidence before me preponderates to support the conclusion that both defendants knew that they were consenting to the search of their vehicle by Trooper Roby, and I so find. Alternatively, even if the defendants did not in fact consent, I find that a reasonable officer in Trooper Roby's position would have believed that they voluntarily and knowingly consented to the search.

IT THEREFORE HEREBY IS RECOMMENDED to the Hon. Richard G. Kopf, United States Chief District Judge, pursuant to 28 U.S.C. §636(b)(1)(B) that the defendant's motions to suppress, filings 18 and 21, be denied in all respects.

The parties are notified that failure to object to this recommendation as provided in the local rules may result in a waiver of the right to appeal the district judge's adoption of findings in the recommendation.

FURTHER, IT HEREBY IS ORDERED, Trial of this case is set to commence at 9:00 a.m. on February 21, 2006 before Judge Kopf in Courtroom No. 1, United States Courthouse, Lincoln, Nebraska. Jury selection will be held at commencement of trial. Trial is scheduled for a duration of three days.

DATED December 30, 2005

BY THE COURT:

*s/* *David L. Piester*
United States Magistrate Judge